**WINCHESTER FEDERAL SAVINGS BANK, et al.   Plaintiffs,**

v.

**The WINCHESTER BANK, INC., Defendant.**

**No.  CIV.A.03–CV–130 JBC.**

United States District Court,
E.D. Kentucky,
Lexington Division.

Nov. 2, 2004.

Charlotte Hill Turner, II, Gregory P. Parsons, Stites & Harbison PLLC, Lexington, KY, Jack A. Wheat, Jennifer L. Kovalcik, Mandala V. Wilson, Stites & Harbison, Louisville, KY, for Plaintiffs.

Charles E. Shivel, Jr., J. David Smith, Jr., Joanne Richards, Shannon A. Singleton, Stoll, Keenon & Park, LLP, Lexington, KY, for Defendant.

## *ORDER*

COFFMAN, District Judge.

This matter is before the court on the motion of the plaintiffs, Winchester Federal Savings Bank ("WFSB") and WinFirst Financial Corp. ("WinFirst"), for partial summary judgment and the motion of the defendant, The Winchester Bank, Inc. ("TWB"), for partial summary judgment. This case arises out of the parties' dispute about ownership rights to the marks WINCHESTER and WINCHESTER FEDERAL SAVINGS BANK. The plaintiffs had prior use in Kentucky. The pending motions require the court to determine whether the marks are protectable and to apply the criteria for determining the likelihood of confusion. The court, having re-

viewed the record and being otherwise sufficiently advised, will grant the plaintiffs' motion and deny the defendant's motion.

## I.  FACTUAL BACKGROUND

The parties are two financial institutions located in Winchester, Kentucky. WFSB is a savings and loan financial institution ("S & L") whose business consists primarily of savings accounts, certificates of deposit, and residential mortgages. The defendant is an independent state commercial bank whose customer base consists mostly of commercial enterprises.

In 1934, WFSB opened under the name Winchester Federal Savings and Loan Association and operated under that name until it changed its name to Winchester Federal Savings Bank in 1988. When WFSB opened in 1934, the former The Winchester Bank—an entity wholly unrelated to the defendant—was in operation, as was Winchester Building & Savings Association ("WBSA").

From 1934 until 1985, three banks operated in Winchester with the word "Winchester" in their names—WBSA, the former The Winchester Bank, and WFSB. Since 1934, the financial institutions' structures and names changed several times. The former The Winchester Bank was bought out and its name was changed to Citizens Fidelity Bank and Trust Company Winchester. Citizens operated under this name until November 1990, and in 1992, it was acquired by PNC Bank, Kentucky and later by Community Trust Bank. WBSA changed its name to Pioneer Federal Savings Bank in 1988 and then to Central Bank & Trust Co. in 1998.

In mid–2001, Ray Watson developed a plan to open a new bank in Winchester. The local newspaper announced the defendant's plan to open under the name The Winchester Bank, Inc. on April 23, 2002.

On May 28, 2002, the newspaper reported that the defendant had received approval to sell stock. The defendant's application for a bank charter was tentatively approved on August 20, 2002. On March 12, 2003, the defendant opened for business to shareholders and a few days later to the general public.

The plaintiff, WinFirst, a bank holding company and sole shareholder of WFSB, is the owner of two service mark registrations issued by the Kentucky Secretary of State. The mark WINCHESTER and the mark WINCHESTER FEDERAL SAVINGS BANK are registered to WinFirst for use in relation to "banking services." WinFirst has also filed applications with the United States Patent & Trademark Office ("PTO") for federal registration of both marks. The PTO has indicated that each "appears to be entitled to registration" and that it would publicly announce its findings. The defendant filed a formal opposition with the PTO complaining of the issuance of registrations of marks so similar to its name. These applications are still pending.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matters of law." Fed. R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "With the benefit of having all evidence and justifiable inferences drawn from such

evidence in its favor, the nonmoving party 'must set forth specific facts showing that there is a genuine issue,' such that a jury could reasonably find for the nonmoving party." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792 (6th Cir.2004) (internal citations omitted).

## III. ANALYSIS

The plaintiffs' amended complaint sets out four counts: Count 1–federal unfair competition under the Lanham Trademark Act, 15 U.S.C. § 1125(a); Count 2–common law unfair competition; Count 3–state trademark infringement on the mark WINCHESTER;[1] and Count 4–state trademark infringement on the mark WINCHESTER FEDERAL SAVINGS BANK. For the plaintiffs to prevail on their state and federal unfair competition claims, they must establish that the marks are indeed valid and protectable trademarks. *DeGidio v. West Group Corp.*, 355 F.3d 506, 510 (6th Cir.2004). Once the plaintiffs establish that the marks are valid and protectable, they must establish that the defendant's service mark is likely to cause confusion among consumers in the marketplace in order to prevail on all of the state and federal claims. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir.1983).

## A. Whether the Marks are Protectable

All of the parties seem to agree that there is no question that the plaintiffs are entitled to protection of the mark WIN-CHESTER FEDERAL SAVINGS BANK. Thus, the argument centers around protection of the mark WIN-CHESTER. The plaintiffs have registered both of the marks with the Kentucky Secretary of State and have filed federal registration applications. The state registrations are sufficient to support a finding that, as to the state infringement claims, the marks WINCHESTER and WIN-CHESTER FEDERAL SAVINGS BANK are protectable. Under federal law, receipt of a registered trademark automatically invokes a statutory presumption that the trademark is valid. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir.1989). "The court may not overrule the decision of registerability of the Patent and Trademark Office (PTO) unless the party challenging the mark argues persuasively that the mark was ineligible for protection." *Id.* at 594. This court will give the same deference to the state registration as it would to the federal registration and finds that the defendant has failed to argue persuasively that the mark was ineligible for protection. Common-law ownership of the marks governs both the federal claim and the state unfair competition claims. *Jackson v. Stephens*, 391 S.W.2d 702, 706 (Ky. 1965).

▮▮▮▮ At common law, ownership of service marks is obtained by actual use. *Allard Enters. v. Advanced Programming*, 249 F.3d 564, 571 (6th Cir.2001). "The first to use the mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used." *Id.* at 572. Here, as against the defendant, the plaintiffs are the senior users of the mark WINCHESTER. Ultimately, however, whether the mark WIN-CHESTER qualifies "for trademark protection is determined by where the mark

---

1. Kentucky has adopted the Model State Trademark Act and it protects against the use of any mark registered under KRS 365.561 to 365.613 by any person without permission in connection with the "sale, distribution, offer-ing for sale, or advertising of any goods or services which is likely to cause confusion or mistake or to deceive as to the source or origin of the goods or services ...." KRS 365.601.

falls along the established spectrum of distinctiveness." *DeGidio,* 355 F.3d at 510. On the spectrum of distinctiveness, generic is the weakest type of mark, followed by descriptive, suggestive, and fanciful/arbitrary. *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 362 (6th Cir. 1984).[2] As a geographic term, the mark WINCHESTER is merely descriptive and can be protected only if it has acquired a secondary meaning. *Union Nat'l Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas,* 909 F.2d 839, 845 (5th Cir.1990).

■ The plaintiffs argue that the mark WINCHESTER has acquired distinctiveness through secondary meaning. "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 766, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Courts look at seven factors to determine whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *DeGidio,* 355 F.3d at 513. "No single factor is determinative and every one need not be proven." *Herman Miller, Inc. v. Palazzetti Imps. & Exps.,*

*Inc.,* 270 F.3d 298, 312 (6th Cir.2001). The plaintiffs must establish that "in the minds of the public, the primary significance of a [service] feature or term is to identify the source of the [service] rather than the [service] itself." *Inwood Labs., Inc. v. Ives Labs.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Here, the service is banking and the plaintiffs have shown that WINCHESTER, with respect to banking services in Clark County, Kentucky, means those services provided by WFSB.

**1. Direct Consumer Testimony**

■ The plaintiffs present some direct consumer testimony to support a finding of "secondary meaning." The plaintiffs rely on an affiant's statement that he has been aware of the plaintiff's mark since the 1970s. Further, in their depositions, the defendant's founder, its former president, and its current president testified that they were aware of WFSB by name prior to opening TWB. Although awareness of the mark is evidence that it has secondary meaning, it is not strong enough to establish that WINCHESTER means banking services provided by the plaintiff. Thus, the court does not heavily rely on this testimony in its decision that the mark has acquired secondary meaning.

**2. Consumer Surveys**

The plaintiffs present survey evidence to support their claim that WINCHESTER

**2.** A generic term is commonly used to describe the relevant type of goods or services and cannot become a trademark under any circumstances. Examples of generic terms include "aspirin" or "escalator." Descriptive terms specifically describe a characteristic or ingredient of an article. Examples of descriptive marks include "best" or "superior." Suggestive terms suggest rather than describe an ingredient or characteristic of the goods and require the observer or listener to use imagination and perception to determine the nature of the goods. Examples of suggestive terms include "Citibank" to connote an urban or modern bank or "Goliath" for wood pencils. Arbitrary marks have a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached such as Apple computers. A fanciful mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned such as EXXON or KODAK. *Champions Golf Club, Inc. v. Champions Golf Club,* 78 F.3d 1111, 1117 (6th Cir.1996).

has a secondary meaning. "Survey evidence has become a well-recognized means of establishing secondary meaning." *Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 182 (1st Cir. 1993). The defendant's complaints about the survey evidence are that the methodology, questions, and data interpretation are flawed, but it offers no survey evidence to rebut it. The court finds that the methodology, questions, and interpretation in the plaintiffs' survey are proper, and the survey evidence is admissible because it is reliable and relevant to the plaintiffs' claim. The survey consisted of open-ended questions, such as asking respondents to identify financial institutions in Clark County and their location. Approximately 35% of the respondents identified WFSB in connection with the word "Winchester" as a bank in Clark County. Thus, the survey results support a finding that WINCHESTER is associated with the banking services provided by the plaintiff.

### 3. *Exclusivity, Length, & Manner of Use*

Although the word "Winchester" has been used in connection with other types of businesses in Winchester, Kentucky, WFSB has been the exclusive user of the service mark WINCHESTER related to banking services in the area since 1990. The word is the predominant portion of WFSB's entire name and has been since 1934 when the bank opened. When a party applies for registration under both the Lanham Act and the Kentucky statute, secondary meaning can be inferred as a result of five years of substantially exclusive use in the relevant market. 15 U.S.C. § 1052(f) and KRS 365.567(5). WFSB was the exclusive user of the mark WINCHESTER for more than five years preceding the opening of TWB, so the court can grant the plaintiffs this inference. Furthermore, the former The Winchester Bank had been absent from the market for

almost twenty years before the defendant decided to open a totally new, unrelated bank with that name. From 1988 to 2003, when the defendant opened, WFSB was the only financial institution in Winchester, Kentucky with WINCHESTER in its name. WFSB has carved out an existence and identity associated with the word "Winchester" and had persevered as all of the other banks in Winchester have changed their names. The continuous use of the word since 1934 and the exclusive use of it since 1990 weighs in favor of the establishment of a secondary meaning.

### 4. *Advertising*

According to the parties, WFSB has spent a modest amount of money promoting its financial products and services. This advertising, however, has been directed at forming a connection between WINCHESTER and its services, which supports the establishment of a secondary meaning. WFSB has focused a large portion of its advertising on emphasizing the word "Winchester" and promoting itself as the locally owned Winchester bank. The defendant cites *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590 (6th Cir.1989), to support a contention that the plaintiff must expend a larger amount of money in order to establish a secondary meaning. While it is true that the *Burke* court considered the amount of money spent on advertising, it is the *effect*, not the extent, of the advertising that is most important. *Security Center, Ltd. v. First Nat. Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir.1985). WFSB advertising was effective in linking its services to the word "Winchester," supporting the establishment of a secondary meaning.

### 5. *Amount of Sales & Number of Customers*

WFSB is one of the largest S & Ls in the state and maintains one of the larger

loan portfolios in the community. These facts support the establishment of a secondary meaning.

### 6. *Established Place in the Market*

WFSB argues that it has achieved broad public recognition in the relevant geographic market. Indeed, the deposition testimony of the defendant's president, former president, and founder supports this argument.[3] As the oldest bank in Clark County, having been in operation since 1934, WFSB is well-established in the market, which supports a finding of a secondary meaning.

### 7. *Proof of Intentional Copying*

While the plaintiffs argue, without proof, that the defendant intentionally copied their mark, the court must consider the evidence in the light most favorable to the defendant. The defendant presents evidence to rebut the plaintiffs' assertions. Thus, the court will assume for purposes of this motion that the defendant did not intentionally copy the plaintiffs' mark.

### B. Likelihood of Confusion

When evaluating the likelihood of confusion, courts analyze and balance the following factors: (1) strength of the mark; (2) similarity of the marks; (3) relatedness of the goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the junior party in selecting the mark; and (8) the likelihood of expansion of the product lines. *Frisch's Rests., Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir.1982).

"These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case .... The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991). A focus on the "ultimate question" is critical when the court reviews a motion for summary judgment; a genuine dispute of material fact on any one of the eight factors is not enough to avoid summary judgment. *AutoZone*, 373 F.3d at 793. Instead, the nonmoving party must show a genuine factual dispute concerning those "factors which may be material in the context of the specific case." *Homeowners*, 931 F.2d at 1107.

In this case, there is no genuine issue of fact as to whether there is a high likelihood of confusion of the defendant's name, THE WINCHESTER BANK, and the plaintiffs' protectable marks, WINCHESTER and WINCHESTER FEDERAL SAVINGS BANK. The infringement on the plaintiffs' mark is likely to cause confusion. Thus, summary judgment for the plaintiff is appropriate.

### 1. *Strength of the Plaintiffs' Service Mark*

The strength of the plaintiffs' mark is determined by the mark's distinctiveness and the degree of recognition in the marketplace. *Homeowners*, 931 F.2d at 1107. A mark's strength is generally a result of

---

**3.** All three admit that they have been familiar with WFSB since the 1970s. (Hiles Depo. pp. 11–12; Terry Depo. pp. 18–19; Watson Depo. pp. 6–7). Mr. Hiles also stated that people understand that Winchester Federal "is there" and that it is more well-known in the city than in the county. (Hiles Depo pp. 19–20).

**568**

(1) its unique nature; (2) its owner's intensive advertising efforts; and (3) which of the four categories the mark occupies—generic, descriptive, suggestive, or arbitrary/fanciful. *Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 631 (6th Cir.2002). A determination that a mark may be protectable does not automatically warrant a conclusion that the plaintiffs' mark is strong in the relevant geographic area. As discussed previously, the mark WINCHESTER is merely descriptive, which weighs against the plaintiffs. Thus, the strength of the mark must be demonstrated by establishing its unique nature or the plaintiffs' advertising efforts.

Overall, the mark WINCHESTER for a business in Winchester, Kentucky, is not unique because it is a geographic term. Further, extensive third-party use of a trademark substantially weakens the strength of the mark. *Homeowners,* 931 F.2d at 1108. The defendant claims that "there are numerous instances of third-party usage of the word 'Winchester'" within the city of Winchester, Kentucky, but it does not cite specific examples. The defendant's exhibits contain a report about the use of Winchester across the country and a list of the entities in Kentucky containing the word, but neither of these exhibits details the use in the relevant geographic area except for one insurance company.

The fact that the plaintiffs have spent only a modest amount of money on advertising does not weigh against them because the effect of their advertising has been to create a strong mark. "When a claimant has no need for traditional advertising because of the nature of its market, it should not feel compelled to advertise simply to protect its service mark." *The Morningside Group, Ltd. v. Morningside Capital Group, LLC,* 182 F.3d 133 (2d Cir.1999). The geographic area involved in this case is relatively small, primarily encompassing Clark County and a small portion of central Kentucky. While the size of the plaintiffs' advertising budget does not normally provide strong evidence regarding the mark's strength, the fact that the plaintiffs have spent the money in a concentrated geographic area does provide some circumstantial evidence in this case. More importantly, other evidence exists which buttresses this conclusion. The plaintiffs have focused their advertising on creating a connection between WINCHESTER and WFSB as a local bank. Further, the plaintiffs have been the exclusive users, with respect to banking and related financial services, of the WINCHESTER mark in Clark County since 1990. Such continuous, exclusive use of a mark, in conjunction with a concentrated advertising campaign, supports a conclusion that the plaintiffs' mark is strong in the local market.

2. *Similarity Between the Plaintiffs' and the Defendant's Service Marks*

"Similarity of marks is a factor of considerable weight. When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of the conflicting marks." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 283 (6th Cir. 1997). Instead of focusing on the marks side by side, courts must "determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks 'may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection' of the other party's mark.'" *Id.* (quoting *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1188 (6th Cir.1988)). Courts must view a mark in its entirety and focus on their overall impressions instead of focusing on the mark's individual features. *Id.*

Here, the parties' marks bear great similarity to each other, which increases the likelihood of confusion. With respect to financial services, WFSB argues that it is known by WINCHESTER and WINCHESTER FEDERAL SAVINGS BANK. The defendant argues that the plaintiffs do not present evidence sufficient to support their claim that WFSB is known by WINCHESTER alone, whereas the defendant is known by the name "The Winchester Bank." Instead, the defendant asserts, "Winchester" is always used in conjunction with other words to describe WFSB. For example, the defendant lists WINCHESTER FEDERAL or WINCHESTER FEDERAL SAVINGS as possible variations on WFSB's name, but not just WINCHESTER. Even if the plaintiffs typically use additional words in conjunction with the word "Winchester" when promoting WFSB's name, the predominant feature of the name is WINCHESTER. Since the word is also the predominant feature of the defendant's name, the likelihood of confusion is high.

The plaintiffs also argue that the logos are similar enough to cause confusion. WFSB's logo often features a stylized, circular-shaped eagle above and to the left of the words WINCHESTER FEDERAL in larger, bold font and SAVINGS BANK in smaller font. This logo is in block type with no italics or internal variation in size within the words. The defendant's logo is generally in italics with a brushstroke, sweeping, partial oval embracing a capital italic "W," to the left of the name. It usually has the full name in three lines, all in italics, with upper- and lower-case letters approximately one-half the size of the "W." When viewed together, the logos are easily distinguishable from each other in appearance. But the test requires to view them separately. *Id.* When viewed alone, each logo's emphasis on the word "Winchester" creates the potential that a con-

sumer with a general understanding of the WFSB mark could confuse the two logos and believe that the services offered by the defendant are related to those offered by the plaintiff.

### 3. Relatedness of the Goods or Services

As the parties concede, they offer similar banking services. The relatedness of the services of the parties fall into three categories: "First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." *Therma–Scan,* 295 F.3d at 632–33. Here, the services fall into the first category—the parties are direct competitors. Although traditionally a number of distinctions existed between the services offered by commercial banks and those of savings and loan associations, those distinctions have all but disappeared. Both parties offer banking and financial services; thus, to a large extent, their services are nearly identical. The close relation of the services weighs in favor of the plaintiffs.

### 4. Actual Confusion

Although evidence of actual confusion is not necessary to prove the likelihood of confusion, it is the best evidence. *Therma–Scan,* 295 F.3d at 634. When a party presents evidence of actual confusion, it strongly suggests the potential for confusion. *Mktg. Displays, Inc. v. TrafFix Devices, Inc.,* 200 F.3d 929, 935 (6th Cir.1999) *rev'd on other grounds* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). The weight given to such evidence depends, however, upon the type and amount of confusion that occurs. *Therma Scan,* 295

F.3d at 634. The fact that at least some confusion has occurred favors the plaintiffs to some extent. *Daddy's Junky Music*, 109 F.3d at 284.

The plaintiffs offer evidence of actual confusion: telephone calls intended for the defendant but received by WFSB, misdirected mail and deliveries, telephone calls to WFSB seeking to confirm employment of defendant's employees, customers coming to WFSB's locations to visit people who work for the defendant, and an inquiry whether the parties are the same bank.

Serious confusion among actual customers is afforded greater weight. *Homeowners*, 931 F.2d at 1110. The plaintiffs cite several examples of such confusion: a direct debit processed by a vendor through WFSB which should have been charged against an account with the defendant, people seeking to cash checks drawn on the defendant, mortgage payoff checks intended for WFSB made out to the defendant, and a customer of the defendant seeking to make a deposit at WFSB's institution. The numerous instances of actual confusion weigh strongly in favor of the plaintiffs.

### 5. *Marketing Channels Used*

This factor requires courts to consider the similarities or differences between the predominant customers of the parties' respective goods or services. *Homeowners*, 931 F.2d at 1110. Further, a court must determine whether the marketing approaches employed by the parties resemble each other. *See id.* The predominant customers of WFSB's banking services are individuals, while the predominant customers of the defendant's banking services are commercial enterprises. Nonetheless, because there is significant overlap, both parties use the same channels to market their services. For example, both parties advertise through the use of billboards, local newspapers, and participation/sponsorship of local events. The overlap in marketing channels significantly adds to the likelihood of confusion in this case, especially since the community is small and the target audience is similar.

### 6. *Purchaser Care*

The degree of care used by a consumer in selecting a bank or financial institution is not readily determinable. The plaintiffs present no evidence to support their claim that consumers do not exercise a high degree of care in selecting banks. Likewise, the defendant presents no evidence to support a claim that consumers do exercise a high degree of care. Thus, the court does not attach great significance to this factor.

### 7. *The Defendant's Intent*

The defendant's intent is relevant only if the plaintiffs show that the defendant knowingly copied the contested trademark. "Yet, the defendant's good intentions do not in any way preclude a finding of likely confusion." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1189 (6th Cir.1988). The plaintiffs argue that the defendant intended to copy the trademark. The defendant argues that it did not intend to copy the plaintiffs' mark but intended only to copy and benefit from the goodwill from the former The Winchester Bank. Because this is an unresolved issue of fact, the court does not attach great weight to this factor.

### 8. *Likelihood of Expansion*

This element is not significant in this analysis since the parties already occupy the same market. *Little Caesar Inc. v. Pizza Caesar Inc.*, 834 F.2d 568, 572 (6th Cir.1987).

Overall, the factors weigh in favor of the plaintiffs. The likelihood of confusion is great because of the strength of the plain-

tiffs' mark, the similarity of the parties' marks, the relatedness of services, and the marketing channels used. Additionally, the most convincing factor in favor of the plaintiffs is the evidence of actual confusion.

## C. Defendant's Counterclaims

The defendant pled several counterclaims in its answer. In its motion for summary judgment it discusses the following: Count 1–cancellation of Kentucky registration and pending federal trademark application for WINCHESTER; and Count 2–non–infringement of the mark WINCHESTER. Count 2 was resolved by the discussion above; the defendant did infringe on the plaintiffs' use of the mark WINCHESTER. Thus, the defendant fails on Count 2. Further, Count 1 is not an appropriate action for this court to take because the plaintiffs have a protectable interest in the mark WINCHESTER. Accordingly,

**IT IS ORDERED** that the plaintiffs' motion for partial summary judgment (DE 142) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendant's motion for partial summary judgment (140) is **DENIED**.

**IT IS FURTHER ORDERED** that the parties' pretrial compliance shall relate solely to the issue of damages. The pretrial conference and trial remain scheduled for November 17, 2004 and December 6, 2004 respectively.